## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| ASSOCIATION OF AMERICAN PHYSICIANS AND SURGEONS EDUCATIONAL FOUNDATION, PIERRE KORY, M.D., PAUL MARIK, M.D., and KARL N. HANSON, M.D., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 3:22-cv-240 |
| v. | ) ) | |
| AMERICAN BOARD OF INTERNAL MEDICINE, AMERICAN BOARD OF OBSTETRICS & GYNECOLOGY, AMERICAN BOARD OF FAMILY MEDICINE, and KRISTI NOEM, in her official capacity as the Secretary of the U.S. Department of Homeland Security, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## AMENDED COMPLAINT

Plaintiffs Association of American Physicians and Surgeons Educational Foundation ("AAPS"), Pierre Kory, M.D. ("Kory"), Paul Marik, M.D. ("Marik"), and Karl N. Hanson, M.D. ("Hanson" and, collectively, the "Individual Plaintiffs"), seek declaratory, injunctive, and monetary relief against Defendants American Board of Internal Medicine ("ABIM"), American Board of Obstetrics & Gynecology ("ABOG"), American Board of Family Medicine ("ABFM"), and Kristi Noem ("Noem"), in her official capacity as the Secretary of the U.S. Department of Homeland Security ("DHS"), based on the following allegations.

### NATURE OF THE ACTION

1.     This action is brought by a co-sponsor of medical conferences and publisher

of educational materials on the internet, Plaintiff AAPS, and several physicians against Defendants concerning their unprecedented campaign to censor speech and retaliate against those who express views disfavored by Defendants. Using nearly identical terminology and timing, Defendants have acted in an apparently coordinated manner to attain their common objective of censorship based on viewpoint. The Individual Plaintiffs are physicians who have been harmed by the retaliation by Board Defendants, including revocation of the board certifications of two of them and a pending revocation of the third.

2.      Defendants ABIM, ABOG and ABFM (the "Board Defendants") have certification monopolies in their respective specialties, certifications that are based primarily on written multiple-choice medical examinations. Though ostensibly nonprofit and non-partisan, they have been outspokenly allied with the Biden Administration on fundamental issues including opposition to ivermectin as early treatment for COVID-19, support of mandatory COVID-19 masking, lockdowns, and vaccination, and also abortion rights and transgender procedures.

3.      The Board Defendants announced their unprecedented campaign to take action against certifications earned by physicians, based on their public statements, which have included retaliating against physicians based primarily on their testimony before legislative committees. Defendants ABIM and ABFM sent letters to physicians threatening them with revocation of their earned board certifications based on the exercise by those physicians of their First Amendment rights on matters of public policy, and both of these Defendants have revoked several board certifications. Defendant ABOG publicly warned physicians against making statements against abortion, lest they have their earned board

certifications revoked by ABOG if it disagrees with such statements. In at least one congressional hearing, a Democratic congressman and his supportive witness – both on the same side of abortion rights – had an apparently coordinated exchange that threatened revocation by ABOG of an opposing witness's board certification for her testimony against abortion.

4.     The Board Defendants retaliated against physicians who were praised by Robert F. Kennedy, Jr., in his bestselling book, *The Real Anthony Fauci*. In some cases, the retaliation has been based expressly on criticism by physicians of Dr. Fauci himself, who as a government official may be freely criticized. In at least one case, retaliation by Defendant ABIM was based on comments a physician made to a church congregation during a religious gathering.

5.     On or about May 26, 2022, Defendant ABIM abused its monopoly power by sending unprecedented threatening letters to multiple prominent ABIM-certified physicians, including at least one practicing in Texas, for making public statements that disagreed with the approach taken by Dr. Fauci and the Biden Administration to COVID-19. ABIM then made good on those threats by revoking the certification of Plaintiffs Kory and Marik for making statements about the COVID-19 pandemic with which Defendants disagreed. Likewise, and apparently in a coordinated manner, Defendant ABFM abused its monopoly power by sending similar threatening letters to multiple prominent ABFM-certified physicians, also for making statements critical of positions promoted by the Biden Administration concerning COVID-19. These threatening letters by ABIM and ABFM did not explain any specific inaccuracy about anything said by these physicians or provide

evidence of any specific falsehood.

6.      Although only official state medical boards have the proper authority to regulate the practice of medicine, certifications by the Board Defendants constitute a *de facto* essential credential for practicing in most hospitals and participating in most networks. By threatening to revoke board certification of physicians, and actually doing so, the Board Defendants engage in state action, and intentionally and improperly chill speech by physicians without the political accountability of official state medical boards.

7.      Alejandro Mayorkas ("Mayorkas"), in his capacity as a Cabinet official in the Biden Administration, monitored and took actions against what a federal agency considers to be misinformation and disinformation. As Meta Platforms (formerly Facebook) CEO Mark Zuckerberg apologized in a letter in 2024 to the Chairman Jim Jordan (R-OH) on the Committee on the Judiciary of the U.S. House of Representatives:

> In 2021, senior officials from the Biden Administration, including the White House, repeatedly pressured our teams for months to censor certain COVID-19 content, including humor and satire. … I believe the government pressure was wrong, and I regret that we were not more outspoken about it."[1]

8.      "In all, Facebook took down more than 20 million pieces of content in just over a year."[2] Likewise, Facebook imposed censorship-type disclaimers against AAPS

---

[1] Letter by Mark Zuckerberg to Chairman Jim Jordan of the Committee on the Judiciary, U.S. House of Representatives (August 26, 2024). https://www.facebook.com/photo/?fbid=919665486871535&set=pcb.919665756871508&locale=en_GB (viewed Sept. 29, 2024).
[2] Kurt Wagner, "In all, Facebook took down more than 20 million pieces of content in just over a year," TIME (Aug. 27, 2024). https://time.com/7015026/meta-facebook-zuckerberg-covid-biden-pressure-censorship/ (viewed Sept. 29, 2024).

postings during the COVID era, and videos from AAPS were taken down from YouTube based on similar pressure by federal government officials.

9.    Defendants' actions harm the conferences and fundraising efforts by Plaintiff AAPS, which depend on robust freedom of speech in-person and on the internet. Presenters and outspoken participants at these videoed conferences co-sponsored by AAPS have received letters threatening revocation of their earned board certifications, for statements they made at AAPS co-sponsored conferences and elsewhere.

10.    Defendants' actions have intentionally harmed the Individual Plaintiffs by interfering with their ability to practice in hospitals, for which board certification by the Board Defendants is typically required, and to be in many insurance networks which also require board certification. In addition, Defendants have chilled the speech of the Individual Plaintiffs, contrary to their constitutional rights.

11.    The common goal of all the Defendants has been, and continues to be, to censor or chill public statements made by physicians who are frequently on the side of the political spectrum opposite to Defendants or those who have reached different scientific conclusions, relating to controversial government policies in the field of medicine. The Board Defendants have been acting in concert with officials of the federal government in retaliating against physicians for being opposed to certain policies.

**PARTIES**

12.    Founded in 1996, Plaintiff Association of American Physicians and Surgeons Educational Foundation ("AAPS") is a non-profit organization incorporated under the laws of Arizona and headquartered in Tucson, Arizona. AAPS co-sponsors medical education

conferences, including subsidizing attendance by medical students and residents at such conferences. AAPS posts videos on the internet of presentations made by physicians and others at its conferences, including participation by attendees in extensive Q&A and discussions. AAPS raises money based on these activities.

13. Plaintiff Pierre Kory, M.D., M.P.A. ("Kory"), is a physician licensed in good standing in Wisconsin, California and New York. He was Board Certified by the ABIM in Internal Medicine in 2005, Pulmonary Disease in 2007 and Critical Care Medicine in 2008, all in good standing until they were revoked on August 8, 2024, by ABIM (hereinafter, "ABIM Decisions"). Dr. Kory is a former Associate Professor and Chief of the Critical Care Service at the University of Wisconsin, and has published more than 50 peer-reviewed papers, and 17 book chapters, and served as senior editor of an award-winning textbook now published in its 2nd edition and translated into 7 languages. Dr. Kory has extensive experience treating ambulatory and hospitalized COVID-19 patients and has published more than 12 research papers on COVID-19. Dr. Kory has presented at medical conferences and testified as an expert witness in Texas. He is currently listed as an expert witness in a case before the Texas Medical Board that is affected by the ABIM revocation of his certification. He has never been sued for malpractice and is currently a resident of Florida.

14. Plaintiff Kory became a focus of the ire of Defendants because he was actively exercising his right to petition government, for example testifying before the U.S. Senate Committee on Homeland Security and Governmental Affairs, as chaired by Senator

Ron Johnson (R-WI) at the time. Dr. Kory testified on May 6, 2020,[3] regarding the use of corticosteroids in COVID patients which was not widely recognized as beneficial until later, and on December 8, 2020,[4] in support of the use of ivermectin. These are constitutionally protected activities.

15. Plaintiff Paul E. Marik, M.D., FCCM, FCCP ("Marik"), is a physician who was Board Certified in Internal Medicine in 1998 and Critical Care Medicine in 2009; he was placed on inactive status when he retired from clinical practice but remained in good standing until his certifications were revoked on August 8, 2024 by the ABIM Decisions, which were virtually identical against both him and Plaintiff Kory. Dr. Marik is a resident of the State of Virginia, where he voluntarily allowed his medical license to lapse. Dr. Marik has been an expert witness and presenter at medical conferences in Texas. He has written over 500 peer reviewed journal articles, 80 book chapters, authored four critical care books, and is the senior editor of the only published textbook on COVID-19. He has been cited over 52,900 times in peer-reviewed publications, has a prestigious H-index of 110, and has delivered over 350 lectures at international conferences and visiting professorships. He also has received numerous teaching awards, including the National Teacher of the Year award by the American College of Physicians in 2017. He is the

---

[3] https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/Testimony-Kory-2020-05-06-REVISED.pdf (viewed Oct. 19, 2024).

[4] https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/Testimony-Kory-2020-12-08.pdf (viewed Oct. 19, 2024).

second-most published critical care physician in the world and has co-authored 18 papers on therapeutic approaches to COVID-19. He has delivered conference presentations, expert testimony and undertaken other professional activities in Texas that will be affected by the ABIM's revocation of his board certification.

16. Plaintiff Karl N. Hanson, M.D. ("Hanson"), is a physician who resides and practices clinical family medicine in Louisiana, where he is licensed in good standing. Plaintiff Hanson participated in the AAPS conference held in San Antonio in September 2024. He has long been board-certified in good standing by Defendant ABFM, which as of October 2, 2024, listed him on its website as "Clinically Active" since June 28, 2018, even though he has been active in clinical practice since he was board certified in 1987.

17. Defendant American Board of Internal Medicine ("ABIM") is a nonprofit organization based in Philadelphia, Pennsylvania, which certifies physicians nationwide in the specialty of internal medicine, primarily on the basis of performance on a written multiple-choice examination. ABIM does business in Texas by certifying and taking disciplinary actions against physicians here, in collusion with the Texas-based Defendant American Board of Obstetrics & Gynecology, while the Chairman of the Board of Directors of ABIM, Rajeev Jain, M.D., resides in Texas.

18. Defendant American Board of Obstetrics & Gynecology ("ABOG") is a nonprofit organization having its principal place of business in Dallas, Texas. ABOG certifies physicians nationwide in the specialty of obstetrics and gynecology, also primarily on the basis of performance on a written multiple-choice examination.

19. Defendant American Board of Family Medicine ("ABFM") is a nonprofit

organization based in Lexington, Kentucky, which certifies physicians nationwide in the specialty of family medicine, on the basis primarily of performance on a written multiple-choice examination. ABFM does business in Texas by certifying and taking disciplinary actions against physicians here, and by colluding with Defendant ABOG and the Federation of State Medical Boards, both of which are headquartered in Texas.

20.     Defendant Kristi Noem is the Secretary of the U.S. Department of Homeland Security, a federal agency.

## JURISDICTION AND VENUE

21.     This action arises out of federal law: Defendants' ongoing violations of the First Amendment of the U.S. Constitution, the Board Defendants' violation of the Sherman Act, 15 U.S.C. §§ 1 & 2, and then-DHS Secretary Mayorkas's violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 706. This action thereby raises federal questions over which this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361. This Court also has jurisdiction over the Sherman Act claims under 28 U.S.C. § 1337 and 15 U.S.C. §§ 15, 26. Supplemental jurisdiction over the claims for tortious interference, contractual violations of due process, and defamation exists under 28 U.S.C. § 1367.

22.     This Court has personal jurisdiction over all the Defendants for the purposes of both original and supplemental jurisdiction pursuant to the Texas long-arm statute Tex. Civ. Prac. & Rem. Code § 17.042(1) and (2) ("Acts Constituting Doing Business in the State.").

23.     Because this Court has jurisdiction as a threshold matter, the Declaratory

Judgment Act, 28 U.S.C. §§ 2201-02, provides this Court with the power to "declare the rights and other legal relations of any interested party…, whether or not further relief is or could be sought." 28 U.S.C. § 2201; *accord* FED. R. CIV. P. 57 advisory committee note ("the fact that another remedy would be equally effective affords no ground for declining declaratory relief").

24.     Venue is proper in this United States District Court for the Southern District of Texas, Galveston Division, under 28 U.S.C. § 1391(d) & (e)(1). Defendant ABOG is a resident of Texas that does business in this venue and is subject to personal jurisdiction here. Defendants ABIM and ABFM do business within this venue also and, upon information and belief, Defendant Noem, through DHS, employs agents here. Defendant ABIM has expressly threatened at least one prominent Texas physician with revocation of certification based on his public exercise of his freedom of speech. AAPS co-sponsors events in Texas and within the Southern District of Texas and plans to hold an event within this Galveston division, but Defendants interfere with and chill freedom of speech in interference with these conferences by AAPS.

## Ongoing Injuries to Plaintiffs

25.     Defendants are causing a direct monetary harm to Plaintiff AAPS in the form of imposing a chilling effect on speakers at its conferences, which has a corresponding decrease in attendance at those events, lost internet traffic with respect to a reduction in videos posted from those conferences, and a resultant corresponding decline in conference fees and donations to AAPS.

26.     Defendants cause ongoing harm to the Individual Plaintiffs by chilling what

they can say amid threatened and actual retaliation against their board certifications, which reduces opportunities for these physicians, interferes with their ability to practice medicine, and harms their professional reputations.

27.     The Board Defendants engage in tortious conduct by misusing their monopoly power over board certification, which while based primarily on performance on written multiple-choice examinations subjects its certificate holders to public sanctions including revocation of their certifications in order to chill and interfere with the presentation of alternative viewpoints at medical conferences and on the internet, including interference with those activities by Plaintiffs.

28.     Then-DHS Secretary Mayorkas chilled and infringed on Plaintiffs' First Amendment right of freedom of speech and caused immediate and redressable First Amendment injuries to Plaintiffs by imposing censorship based on viewpoint. Defendant Noem further causes ongoing harm to Plaintiffs by continuing these policies and failing to comply with the Federal Advisory Committee Act ("FACA"), which constitutes a violation of the APA.

### Personal Jurisdiction over Defendants ABIM and ABFM

29.     Defendants ABIM and ABFM have purposefully targeted their actions against physicians who reside and practice in Texas, including speakers and attendees of AAPS conferences held in Texas, in order to suppress viewpoints, censor statements at AAPS's conferences, and harm physicians' reputations and practices, all in Texas. These communications by the Board Defendants have included letters expressly written to the addresses of Texas physicians and sent by these Defendants for the targeted physicians to

receive in Texas.

30. Defendants ABIM and ABFM have colluded and conspired with two Texas organizations, Defendant ABOG and the Federation of State Medical Boards (FSMB), both of which are headquartered in the Dallas area. Defendants ABIM and ABFM have taken their actions at issue here in furtherance of their conspiracy with these Texas entities.

31. Defendants ABIM and ABFM, through their umbrella organization the American Board of Medical Specialties (ABMS), have repeatedly hired lobbyists in seeking and protecting benefits from the Texas legislature. For example, ABMS retained a lobbyist in Houston, Texas, in 2017 to oppose a bill that was enacted by the Texas legislature and signed into law to establish a right not to be required to participate in mandatory application of Maintenance of Certification (MOC) as a condition of hospital medical staff privileges, which is a product sold by Defendants ABIM and ABFM in Texas to physicians here in addition to their initial board certification products.

32. Defendants ABIM and ABFM, again through their umbrella organization ABMS, continued to retain that same lobbyist in 2018 through 2019 and added two additional Austin lobbyists for those years, for the purpose of obtaining legislation favorable to the board certification monopoly by Defendants ABIM and ABFM in Texas. Defendants ABIM and ABFM, through ABMS, continued to retain Texan lobbyists in 2020, and in 2021 retained five such lobbyists from Austin and Houston, Texas, for the same purpose of obtaining legislation to enhance the sale of products of Defendants ABIM and ABFM in Texas. Two Texan lobbyists were likewise retained in 2022.

33. Defendants ABIM and ABFM are knowledgeable and fully intend that their

adverse actions against physicians in Texas will be publicly displayed by the Texas Medical Board on its website as to each physician licensed in Texas.

34. Defendants ABIM and ABFM are knowledgeable and fully intend that nearly all hospitals in Texas will deny medical staff privileges to physicians whose board certification has been revoked by Defendant ABIM or ABFM.[5]

35. Defendants ABIM and ABFM sought and obtained the requirement by the Interstate Medical Licensure Compact (IMLC), which has been enacted by Texas, to require board certification by these Defendants in their specialties. The revocation of board certification by these Defendants has the intended effect of denying the subject physicians the ability to obtain medical licensure via the IMLC in Texas.

36. Defendants ABIM and ABFM receive a significant amount of revenue each year from physicians residing in Texas, and the Chairman of the Board of Directors of ABIM, Rajeev Jain, MD, resides and works in Dallas, Texas, while doing work there on behalf of ABIM.

37. Defendant ABIM intentionally plays a significant role in continuing medical education (CME) in Texas. Notable events include the 43rd Annual Internal Medicine Review hosted by Baylor Scott & White in South Padre Island, where physicians can earn ABIM Maintenance of Certification (MOC) points. For a fee, these conferences provide

---

[5] The FSMB acknowledges that "practical considerations – such as obtaining hospital privileges" cause physicians to seek board certification. https://www.fsmb.org/u.s.-medical-regulatory-trends-and-actions/guide-to-medical-regulation-in-the-united-states/about-physician-licensure/ (viewed Oct. 20, 2024).

education on important medical topics like geriatrics, cardiology, and asthma treatments.[6]

**Monopoly Power and Antitrust Injury**

38.    The Board Defendants have monopoly power in their respective specialties, as each controls an estimated 80% of the certification of physicians in their corresponding specialties.[7]

39.    By purpose and effect, the Board Defendants chill speech by physicians on controversial matters of government policy, such as masking and vaccine mandates.

40.    The Board Defendants know that their monopoly power has a coercive effect on physicians, who risk losing their medical careers if the Board Defendants revoke their board certification.

41.    The Board Defendants intend to guide and control public discussion about controversial government policies with the actions they threaten and take against physicians based on their viewpoints.

42.    The Board Defendants are abusing their monopoly power with their actions, which would not have their intended affect in the absence of that monopoly power.

43.    Censorship of speech is the Board Defendants' intended result of their

---

[6] https://ce.bswhealth.com/2024IMR (viewed Oct. 15, 2024).

[7] "79.1% of all licensed physicians in the United States are board certified by an American Board of Medical Specialties organization," which includes the Board Defendants in their respective specialties. ABIM, "Board Certification Basics" (quoting Drs. Richard J. Baron & Clarence H. Braddock III in "Knowing What We Don't Know — Improving Maintenance of Certification" New England Journal of Medicine). https://www.abim.org/media-center/facts-figures/board-certification-basics/#:~:text=The%20medical%20profession%20has%20broadly,Board%20of%20Medical%20Specialties%20organization.%E2%80%9D (viewed Oct. 17, 2024).

actions.

44. The speakers and attendees at AAPS conferences, who are videoed with postings subsequently made on the internet, would be more candid and outspoken if the Board Defendants were not allowed to retaliate without due process against them based on viewpoint discrimination. The AAPS conferences would be more lively and effective, and better able to attract attendees and raise funds.

45. Plaintiffs Kory and Marik have been directly harmed by the Board Defendants' actions, as their board certifications have been taken from them due to their speech. This severely injures their professional careers, rendering it virtually impossible for them to practice on a medical staff of a hospital or be part of many insurance networks, and intentionally undercutting their ability to credibly speak on critical public health matters.

46. Plaintiff Hanson is directly harmed by the Board Defendants' actions, as his speech is chilled by Defendant ABFM's threat – in collusion with the other Board Defendants – of revocation of his board certification based merely on his comments relating to public policy which are posted on the internet or otherwise made public.

**Irreparable Harm and Inadequacy of Alternate Remedies**

47. Plaintiffs have First Amendment injuries to their rights of freedom of speech, for which the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Accordingly, Plaintiffs have suffered – and continue to suffer – irreparable harm.

48. Similarly, the violations first by Mayorkas and then by Defendant Noem of

the APA cause ongoing and irreparable harm to Plaintiffs, because Mayorkas's final agency actions without compliance with FACA cannot be adequately remedied. Plaintiffs suffer injury because Mayorkas's final agency actions result in an infringement on Plaintiffs' rights to have administrative compliance by federal agencies with the mandates of FACA, through application of the APA.

## FACTUAL BACKGROUND

### The Board Defendants

49.     The Board Defendants are certification businesses that certify physicians in specialties based primarily on their performance on written multiple-choice examinations administered near the beginning of their professional careers. The Board Defendants have no meaningful academic affiliations, and no demonstrable expertise in anything related to COVID-19, its treatment, vaccination of pregnant women, mask mandates, lockdowns, harm caused by abortion, or transgender operations on children.

50.     On behalf of ABIM, and posting as its then-President and CEO, Dr. Baron wrongly defamed those who disagree with his approach to COVID-19 as being "friends of the virus." *A Message From Dr. Richard Baron About COVID-19 Misinformation.*[8] No American physician, and certainly none of the physicians targeted by ABIM for retaliation, was a "friend[]" of COVID-19.

51.     Dr. Baron also falsely stated that "COVID prevention" is the purpose of COVID vaccination, and that physicians "must" agree with this falsehood:

---

[8] https://blog.abim.org/a-message-from-dr-richard-baron-about-covid-19-misinformation/ (emphasis added, viewed Oct. 17, 2024).

[T]he community of physicians that composes ABIM **must feel obliged** to recommend vaccination as a first-line strategy for COVID **prevention**.[9]

52.     Dr. Robert Redfield, the former director of the CDC, testified on July 11, 2024 before a Senate oversight hearing entitled "Risky Research: Oversight of U.S. Taxpayer Funded High-Risk Virus Research" that the FDA pushed a false "safe and effective" COVID vaccine narrative by underreporting adverse events. The mRNA shots "never should have been mandated. … They don't prevent infection, they do have side effects," Redfield told the U.S. Senate Committee on Homeland Security and Governmental Affairs Committee.[10] Redfield also stated, "There was not appropriate transparency from the beginning about the potential side effects of these vaccines, and I do think there were inappropriate decisions by some to try to underreport any side effects because they argued that would make the public less likely to get vaccinated."[11]

53.     In its own Policies & Procedures, ABIM states that its primary grounds for revoking its board certification is if a physician's license to practice medicine has been restricted, suspended, or revoked, or if he has engaged in "misconduct in connection with an ABIM examination." *ABIM Policies & Procedure for Certifications* ("*ABIM Policies*"), at 18.[12] ABIM does not claim any authority in its *Policies & Procedures* to discipline

---

[9] *Id.* (emphasis added).

[10] https://thevirginiastar.com/news/former-cdc-director-says-fda-underreported-adverse-side-effects-of-covid-injections-to-prevent-vaccine-hesitancy/VAStarStaff/2024/07/14/ (viewed Oct. 17, 2024).

[11] https://www.themainewire.com/2024/07/former-trump-cdc-director-accuses-bidens-fda-of-deliberately-lying-about-mrna-vaccine-side-effects/ (viewed Oct. 17, 2024).

[12] https://www.abim.org/Media/splbmcpe/policies-and-procedures.pdf (viewed Oct. 19, 2024).

physicians based on "legitimate scientific" disagreement with their public statements on matters of public policy, *ABIM Policies* at 19, and yet is doing that anyway.

54. Similar to the unprecedented conduct by the ABIM alleged herein, Defendant ABFM has sent out threatening letters to physicians based not on their treatment of patients or their performance on ABFM's written multiple-choice examinations, but based on the physicians' statements about matters of public policy.

55. On September 27, 2021, Defendant ABOG announced that it would take action against a physician's board certification for not "behaving professionally with patients, families, and colleagues across health professions."[13] Then ABOG's statement refers to "pregnant people" three times and "pregnant individuals" once, as though professionalism requires referring to pregnant women with a gender neutral term and fully accepting transgender procedures in connection with pregnancy.

56. On July 7, 2022, Defendant ABOG announced that it might revoke board certifications of physicians opposed to abortion if they provide "false or misleading information" that is "used to advocate for legislation, regulations, criminal code, and health policy."[14] This infringes on the constitutional rights of physicians to participate fully and candidly in the processes of legislation and public policy decision-making. What ABOG considers to be "false or misleading" is almost any statement in opposition to abortion.

---

[13] https://www.abog.org/about-abog/news-announcements/2021/09/27/statement-regarding-dissemination-of-covid-19-misinformation (viewed Oct. 20, 2024).

[14] https://www.abog.org/about-abog/news-announcements/2022/07/07/statement-regarding-misinformation-and-disinformation-and-medical-professionalism (viewed Oct. 12, 2024)

ABOG denies harm caused by abortion, even harm reported in peer-reviewed published medical studies. ABOG is deliberating chilling free speech on this issue by physicians based on viewpoint, and ABOG's threats harm Plaintiffs by interfering with presentations and participation at conferences.

57.     The Board Defendants' conduct appears to be coordinated, in a concerted attempt to advance a partisan political agenda. Upon information and belief, Board Defendants are aware of the partisan positions taken by federal agency officials on the relevant issues, and Board Defendants seek to appease, or respond to pressure or requests by, federal agency officials to censor the expression of independent viewpoints by physicians.

**State Action**

58.     The practice of medicine is a highly regulated field.

59.     Governments have delegated state functions to the Board Defendants in connection with medical licensure, which is exclusively a governmental function.

60.     Specifically, a total of 40 states, plus Washington D.C. and Guam, have enacted the Interstate Medical Licensure Compact (IMLC) to grant medical licenses in many states on an expedited basis. "Eligible physicians can qualify to practice medicine in multiple states by completing just one application within the Compact, receiving separate licenses from each state in which they intend to practice."[15]

61.     As set forth on the IMLC website, state licensure under the IMLC is limited

_____

[15] https://imlcc.com/faqs/ (viewed Sept. 28, 2024).

to those who "[h]old a current specialty certification or time-unlimited certification by an ABMS [American Board of Medical Specialties] or AOABOS [American Osteopathic Association Bureau of Osteopathic Specialists] board."[16] This refers to the Board Defendants, for all who hold a medical degree, with respect to the large specialties of internal medicine, family medicine, and obstetrics & gynecology.

62.     Accordingly, 40 states (including Texas) have delegated the determination of who is eligible for state licensure via the IMLC to the Board Defendants.

63.     Revocation of certification by the Board Defendants thereby disqualifies a physician from being eligible for licensure via the IMLC, despite satisfying all other requirements for licensure.

64.     Ineligibility for the IMLC, as caused by Board Defendants, thereby precludes the Individual Plaintiffs from job opportunities in Texas.[17]

65.     In addition, the Texas Medical Board website lists, as part of each physician's professional profile, his certification status with ABIM, ABFM, ABOG, and other ABMS-affiliated boards for other specialties.

66.     The FSMB is comprised of, funded, and controlled by state medical boards.

67.     In 2021-22 the Chairman of the FSMB was Kenneth B. Simons, M.D., who had been the Chairman of the Wisconsin Medical Examining Board (MEB), which is a

---

[16] *Id.* (viewed Sept. 28, 2024).
[17] "Active and unrestricted Interstate Medical Licensure Compact (IMLCC) preferred," for example, by a job opportunity in Texas posted by Included Health. https://startup.jobs/tx-licensed-physician-urgent-care-part-time-included-health-5905345 (viewed Oct. 20, 2024).

state entity.

68.     At Dr. Simons' request, the FSMB developed and issued a statement against so-called misinformation and disinformation, which included Dr. Simons as a co-signatory.[18]

69.     The Board Defendants then agreed with the FSMB, which took credit that other health organizations including the umbrella organization for the Board Defendants, ABMS, then agreed with FSMB on this by threatening adverse actions against physicians based on their public statements about matters of public policy.[19]

70.     Indeed, the FSMB, which was founded in 1912, was a co-founder of the umbrella group ABMS in 1933,[20] which then three years later helped found Defendant ABIM and 36 years later helped establish Defendant ABFM. ABMS includes all of the Board Defendants – ABIM, ABFM, and ABOG – as its members.[21] The FSMB is an associate member of the ABMS.[22]

71.     In addition, Texas law permits a medical doctor to publicize that he is board

---

[18] https://www.fsmb.org/siteassets/advocacy/policies/ethics-committee-report-misinformation-april-2022-final.pdf (viewed Oct. 20, 2024).

[19] https://www.fsmb.org/siteassets/advocacy/publications/fsmb-current-annual-report.pdf at p. 5 (viewed Oct. 20, 2024).

[20] https://web.archive.org/web/20091029045110/http://www.abms.org/About_ABMS/ABMS_History/Extended_History/Advisory_Board.aspx (viewed Oct. 20, 2024).

[21] https://www.abms.org/faq/member-boards-of-abms/ (viewed Oct. 20, 2024).

[22] https://www.abms.org/inside-abms/associate-members/ (viewed Oct. 20, 2024).

certified only if he holds board certification from the ABIM, ABFM, ABOG, and other ABMS-affiliated boards for other specialties.

72.  In Texas medical liability cases, the legislature has expressly pointed to board certification as an essential consideration in weighing the qualifications to testify as an expert. Tex. Civ. Prac. & Rem. Code § 74.401(c)(1). This incorporates board certification into the Texas system of justice as a matter of law.

73.  For at least the fiscal years 2013 and 2014, Medicare provided higher reimbursements to physicians who held board certifications from Defendants ABIM and ABFM. 77 Fed. Reg. 66670, 66673.

74.  The Board Defendants report their retaliatory actions against physicians to the National Practitioner Data Bank, which is a database maintained by the federal government that delegates authority and relies entirely on the reporting entities to conduct a genuine peer review of a physician before filing an adverse report against him or her. Reports in the Data Bank have a devastating impact on the targeted physicians, such that they are typically prevented by an adverse report from ever obtaining new employment in their specialty afterward.[23]

75.  The Board Defendants affirmatively sought and lobbied for the foregoing delegations to them by governments. In no instance has any of the Board Defendants disclaimed any of these delegations and interrelation between governments and them.

---

[23] One court analogized an adverse report to "a 'scarlet letter' that could permanently harm a physician's professional reputation." *Cole v. St. James Healthcare*, 2008 MT 453, ¶ 23, 348 Mont. 68, 74-75, 199 P.3d 810, 815.

76. The vast majority of hospitals require board certification as a condition of medical staff privileges, which is a requirement also affirmatively sought by the Board Defendants to increase their revenue and power. Likewise, many insurance networks require board certification as a condition of reimbursement.

77. Board certification is tantamount to state medical licensure for many physicians.

78. Board Defendants' conduct as alleged herein constitutes state action, satisfying the "public function test," "state compulsion (or coercion) test," "joint action test," or "close nexus test."

**Censorship Activities by DHS**

79. DHS is the federal agency taking the greatest responsibility in government over combating so-called misinformation and disinformation on the internet and elsewhere.[24]

80. As the primary advisory committee to the federal government on censorship issues, the Homeland Security Advisory Council (HSAC) was established by DHS on March 8, 2021, its Charter was then filed with Congress on March 11, 2021, and its Charter Renewal was filed on March 7, 2023.

---

[24] For example, on November 2, 2022, in response to a reporter's question, "So you are flagging misinformation?" White House press secretary Karine Jean-Pierre responded, "… I don't have anything more to add. This is a Department of Homeland Security [matter] that I would refer you to." Steven Nelson, "Feds keep Facebook censorship portal despite DHS Disinformation Board demise," *New York Post* (Nov. 2, 2022). https://nypost.com/2022/11/02/white-house-insists-its-not-using-facebook-censorship-portal/ (viewed Sept. 29, 2024).

81.     DHS often follows the recommendations of the HSAC in adopting federal government policies about, and taking actions against, what HSAC considers to be misinformation and disinformation on the internet and elsewhere.

82.     In connection with its disbanding of the Disinformation Governance Board (DGB), DHS declared on August 24, 2022, as follows:

> Statement from the Department of Homeland Security **following the recommendation from the Homeland Security Advisory Council** regarding the Disinformation Governance Board:

> "The Department welcomes the recommendations of the Homeland Security Advisory Council, which has concluded that countering disinformation that threatens the homeland, and providing the public with accurate information in response, is critical to fulfilling the Department's missions. …."[25]

83.     The "HSAC shall be composed of not more than 40 members who are appointed by and serve at the pleasure of the Secretary," currently Defendant Noem. *See* United States Department of Homeland Security, Homeland Security Advisory Council (hereinafter, "HSAC Charter"), p. 3 ¶ 12.[26]

84.     The members of HSAC serve as Special Government Employees, a term defined in 18 U.S.C. § 202(a), and are employed entirely or nearly entirely in the private sector including nonprofit organizations. HSAC Charter at 3 ¶ 12.

85.     HSAC "is established in accordance with and operates under the provisions

---

[25] Homeland Security Press Release, "Following HSAC Recommendation, DHS terminates Disinformation Governance Board" (Aug. 24, 2022) (hereinafter, "*DHS Press Release*")   https://www.dhs.gov/news/2022/08/24/following-hsac-recommendation-dhs-terminates-disinformation-governance-board (emphasis added, viewed Sept. 29, 2024).

[26] https://www.dhs.gov/sites/default/files/publications/HSAC%20Charter%20Final%203.6.15.pdf (viewed Sept. 29, 2024).

of the *Federal Advisory Committee Act* (FACA), Title 5 United States Code, Appendix," and thus is fully subject to the requirements of FACA. *Id.* at 1 ¶ 2 (emphasis in original).

86. In what is known as its "fair balance provision," FACA requires that "the membership of [any] advisory committee … be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee." 5 U.S.C. app. 2 § 5(b)(2). *See Cargill, Inc. v. United States*, 173 F.3d 323, 334 (5th Cir. 1999) (holding that this FACA requirement of fair balance is justiciable).

87. There are currently 32 members of the HSAC, none of whom represents a pro-First Amendment point-of-view that stands against government-induced censorship.[27] For example, there no members of HSAC who represent the media, alternative media, religious organizations, social media influencers, bloggers, vocal supporters of Elon Musk or Robert F. Kennedy, Jr., or other advocates of freedom of speech without government censorship.

88. Similarly, among HSAC's current 32-person membership there is not a single member who is an identifiable political conservative, critic of overreach by the federal government, vocal supporter of Donald Trump, or advocate for less government.

89. Geographically, the Southern and Midwestern regions of the United States are severely underrepresented on the 32-person membership of HSAC, while instead most of the current members have ongoing, substantial connections with Washington, D.C.

90. The HSAC is predominantly comprised of former government officials,

---

[27] https://www.dhs.gov/homeland-security-advisory-council-members (viewed Sept. 29, 2024).

corporate executives, current or former partners of large law firms, political liberals, and others who have no meaningful background in the First Amendment right of freedom of speech, or advocacy of this right.

91.    The charter of HSAC enumerates these permissible backgrounds for its membership:

> Police, fire, emergency medical services and public works;
> Public health and hospital managers;
> State, local, and tribal officials;
> National policy makers;
> Experts in academia and the research community;
> Leaders from the private sector;
> Owners and operators of critical industries, resources, and infrastructure.

HSAC Charter, p. 3 ¶ 12.

92.    Nothing on this list includes or even allows meaningful experience, expertise, or advocacy in First Amendment and other civil rights or on the need for a full range of views on the scientific merits of public policy issues to be represented.

93.    Instead, the membership of HSAC is entirely on the side of (or indifferent to) censorship by government on social media and the internet. None of the members of HSAC is required or likely to have meaningful experience with freedom of speech rights, problems caused by government censorship on social media and the internet, or various approaches for addressing public misinformation or disinformation.

94.    Indeed, the HSAC Charter fails to require or accommodate protection of Americans' First Amendment rights of freedom of speech and religion, or other civil rights, in any way.

95.    The HSAC appointed a subcommittee (the "Subcommittee") that was

comprised of six members. Two of them – fully one-third of this Subcommittee – were at the time attorneys at the very same law firm of Wilmer Cutler Pickering Hale and Dorr, LLP, in its same Washington, D.C., office. *Subcommittee Final Report*, pp. 26-28.[28]

96.    The other four members of the Subcommittee were (1) a senior counsel to another D.C.-based law firm, Covington Burlington, (2) a partner at a West Coast venture capital firm, (3) an executive at United Way Worldwide who previously worked at the Treasury Department and then Goldman Sachs, and (4) the founder and CEO of an international security consultant firm based in New York City.

97.    This Subcommittee lacked balance for all the foregoing reasons that the HSAC lacked the requisite balance under FACA.

98.    The Subcommittee did not comply with any of the transparency and other requirements of FACA.

99.    The Subcommittee issued its report on August 24, 2022 – the same day that then-DHS Secretary Mayorkas, immediately thereafter, made and announced his decision to disband the DGB.

100.    The *Subcommittee Final Report*, on which Mayorkas relied in making his decision to disband DGB, called for DHS to develop "a more strategic approach to disinformation," such that "DHS 'develop a unified strategy to counter disinformation campaigns that appear in social media.'" *Subcommittee Final Report* at 6 & n.1, citing *DHS*

---

[28] Homeland Security Advisory Council Disinformation Best Practices and Safeguards Subcommittee Final Report (August 24, 2022) ("*Subcommittee Final Report*"), https://perma.cc/M9H6-C6XX (viewed Oct. 19, 2024).

*Needs a Unified Strategy to Counter Disinformation Campaigns*, No. OIG-22-58, DHS Inspector General (Aug. 10, 2022).[29]

101.     The *Subcommittee Final Report* stated that:

> We previously recommended to the full Council—and the Council has accepted our recommendation—that there is no need for a separate Disinformation Governance Board. But it is our assessment that the underlying work of Department components on this issue is critical. …
> Apart from [DHS's] public rebuttals, the Department can and should also bring such disinformation to the attention of other government agencies for appropriate action *and to platforms hosting the falsehoods*.

*Subcommittee Final Report* at 12, 13 (emphasis added).

102.     On August 24, 2022, while terminating the DGB, Mayorkas vowed to "continue to address threat streams that undermine the security of our country consistent with the law, while upholding the privacy, civil rights, and civil liberties of the American people and promoting transparency in our work." *DHS Press Release*.

103.     But DHS refused to promise not to reinstate the DGB, whether in the same name or otherwise. In response to a question about this on appeal in this case – which becomes the law of this case – DHS has "refused to assure us that the Department would neither reconstitute the [Disinformation Governance] Board nor replicate its functions through other means." *Ass'n of Am. Physicians & Surgeons Educ. Found. v. Am. Bd. of Internal Med.*, 103 F.4th 383, 398 (5th Cir. 2024) (citing Oral Argument at 17:43-18:37).

104.     In disbanding the DGB, Mayorkas adopted the position "that there is no need

---

[29] https://perma.cc/M9H6-C6XX, linking to https://www.oig.dhs.gov/sites/default/files/assets/2022-08/OIG-22-58-Aug22.pdf (viewed Oct. 3, 2024).

for a *separate* Disinformation Governance Board. But it is our assessment that the underlying work of Department components on this issue is critical." *Subcommittee Final Report* at 12 (emphasis added).

105. The timing of Mayorkas's final decision in disbanding the Disinformation Governance Board was immediately following the recommendation of the ***Subcommittee*** of HSAC, rather than a recommendation by HSAC itself. This process of the Subcommittee advising Mayorkas brought the Subcommittee within the scope of FACA and its requirements because ***the Subcommittee directly advised the then-Secretary of DHS, Mayorkas***.

106. Yet the Subcommittee failed to comply with any of the requirements of FACA for balance, transparency, or on any other issue.

107. The censorship work planned for the DGB did not cease but has simply continued in a dispersed manner among employees of DHS and other federal agencies.

**Defendants' Actions Against Plaintiff AAPS**

108. Plaintiff AAPS co-sponsors conferences, including conferences in Texas, and posts videos on the internet from its conferences and otherwise about issues in public controversy. The topics include COVID-19, abortion, transgender operations on minors, and positions taken by federal agency officials.

109. Defendants' retaliation against speakers at AAPS conferences injures AAPS and chills its First Amendment freedom of speech rights, which broadly include the right to hear.

110. Such censoring and disfavoring of its freedom of speech adversely affects

AAPS and causes it losses in financial support, in the form of decreased attendance at its conferences and reduced contributions to it. AAPS always has extensive discussion and commentary at its conferences with outspoken participation by its attendees.

111.    For example, a vocal meeting attendee who speaks out at AAPS's videoed conferences is being retaliated against by Defendant ABIM based primarily on a presentation she made during a religious gathering of her own church. That was apparently videoed and posted by someone else on the internet, and Defendant ABIM is threatening the revocation of her board certification due to her comments as part of that religious ceremony. The ongoing action by ABIM against her, which has persisted for more than a year, has had a chilling effect on her statements at AAPS meetings, to the detriment of the candor at AAPS's conferences and AAPS's constitutional right to hear.

112.    Two highly acclaimed speakers at AAPS conferences – both having impeccable academic credentials and a lifetime of achievement in medicine – have been subjected to retaliation by Defendant ABIM such that it has had a chilling effect on their candor and outspokenness in their presentations at AAPS conferences.

113.    Another renowned physician spoke at an AAPS conference soon after he received a letter from Defendant ABFM threatening action against its board certification of him. The pendency of this retaliation by Defendant ABFM had a chilling effect on his outspokenness at the AAPS conference, thereby interfering with the constitutional right to hear by AAPS.

114.    Plaintiff Hanson, who is board certified by Defendant ABFM, attended an AAPS conference while subjected to retaliation by Defendant ABFM against his board

certification, and this pending retaliation chilled this physician's participation in the videoed conference in infringement both on his constitutional right to speak and on AAPS's constitutional right to hear.

115. A speaker at an AAPS conference in 2023, in Texas, was previously confronted during a congressional hearing in apparently a coordinated attempt by a congressman and another witness to use Defendant ABOG's threat of retaliation against her. The AAPS conference speaker stated at the hearing that there was a lack of full reporting of harm from abortion. Then Democratic Rep. Gerald Connolly (VA) and a subsequent witness, both in opposition to the views against abortion by the AAPS speaker, reportedly had the following exchange in misuse of ABOG's threat against the AAPS speaker:

> "What do you know about complications and deaths from licensed clinics that provide medically supervised care with respect to abortions?" [Democratic Rep. Gerald Connolly (VA)] asked Dr. Ghazaleh Moayedi, a board-certified abortion provider who was also testifying at the hearing.
>
> Moayedi didn't mince words, replying, "I'd like to first remind all OBGYNs that the American Board of OBGYNs has recently warned that spreading medical misinformation can result in loss of board certification."[30]

Then Rep. Connolly, a supporter of abortion rights, asked the witness to elaborate further on that "misinformation" and decertification assertion against the AAPS conference speaker. This use of ABOG's threat of retaliation against a witness at a congressional hearing had an intimidating, chilling effect on candor about abortion by ABOG-certified

---

[30] https://www.businessinsider.com/abortion-doctor-moayedi-ingrid-skop-obgyn-oversight-hearing-video-2021-9 (viewed Sept. 30, 2024).

physicians, including this physician as she subsequently made a presentation at an AAPS conference.

116. The speakers and attendees at AAPS conferences are nearly entirely physicians and other medical practitioners, who seek candid discussion without any distortions caused by censorship, or any chilling effects from censorship.

117. The full success of AAPS's conferences depends on candor of the presentations by physicians there, and by the candor of attendees when the floor is frequently opened to questions and comments by attendees.

**Defendants' Actions against Plaintiffs Kory and Marik**

118. Defendant ABIM held a joint hearing and issued substantively identical ABIM Decisions revoking the board certifications of Plaintiffs Kory and Marik.

119. The bases given for the revocation of these board certifications were that Drs. Kory and Marik made statements supporting ivermectin and hydroxychloroquine as having a reasonable role in the treatment of COVID-19, and their view that mRNA vaccines have greater adverse effects and less effectiveness than reported by public health authorities and are a cause for concern. Defendant ABIM alleged that these statements were false, inaccurate and misleading.

120. Defendant ABIM held that this conduct violated ABIM's "False or Inaccurate Medical Information" policy, which provides that:

> While ABIM recognizes the importance of legitimate scientific debate, physicians have an ethical and professional responsibility to provide information that is factual, scientifically grounded, and consensus driven. Providing false or inaccurate information to patients or the public is unprofessional and unethical, and violates the trust that the profession of medicine and the public have in ABIM Board

Certification.

*ABIM Policies* at 19.

121.    Plaintiffs Kory and Marik argued before ABIM that they were engaged in legitimate scientific debate and that ABIM policy requires it to articulate a standard to determine a level of evidence that constitutes "legitimate scientific debate," and apply that standard before it could enter an adverse ruling that would expressly determine that Plaintiffs Kory's and Marik's statements did not constitute protected legitimate debate.

122.    ABIM declined to do so and determined it need not elucidate a standard for "legitimate scientific debate" because ABIM rejected all the evidence offered by Drs. Kory and Marik to support their position on ivermectin, hydroxychloroquine and mRNA vaccination, such that ABIM decided there was no basis whatsoever for any claim at issue and thus there was no reason to reach the question of what constitutes legitimate debate.

123.    In each of the findings against Plaintiffs Kory and Marik, ABIM expressly faulted them for not following "consensus-driven scientific evidence." This is directly contrary to the *ABIM Policies* statement that recognizes a role for "legitimate scientific debate." Opinions within the ambit of legitimate debate are, by definition, not consensus-driven. To require consensus where there is evidence of legitimate debate is a violation of the ABIM's own Policies & Procedures.

124.    As is generally the case in developing research, there is scientific evidence suggesting a range of conclusions regarding ivermectin, hydroxychloroquine and mRNA vaccination. While reasonable people can disagree with the aggregate meaning of available research, ABIM's conclusion that there is no evidence whatsoever in support of Drs.

Kory's and Marik's views is arbitrary, capricious, and not credible; reflects ABIM's prejudgment on the issue; and illustrates that fair and due consideration of the matter was not provided.

125. ABIM had published as early as September 1, 2021,[31] its view that a public health consensus had quickly concluded that ivermectin and hydroxychloroquine were not effective. Because ABIM had taken this public position against the use of these widely available, inexpensive off-patent drugs, it was not in a position to fairly consider the evidence regarding in Drs. Kory and Marik's board certifications.

126. ABIM's published position was in fact contrary to the National Institute of Health's COVID-19 treatment guidelines at the time. Acknowledging the recognized expertise of Drs. Kory and Marik regarding repurposed drugs, including ivermectin use for COVID-19, the NIH panel welcomed a presentation by Drs. Kory and Marik in January of 2019. As a result, the NIH elevated ivermectin from its original "do not use" recommendation to "neither recommend for or against" which remained in effect until at least December of 2021. Even those NIH guidelines that state "do not recommend" are expressly not intended to form a basis for disciplinary actions, but ABIM made the determination that recommending ivermectin would be misinformation at the very time that NIH has stated there was sufficient information for physicians to consider ivermectin as a treatment for COVID-19.[32]

---

[31] https://www.ama-assn.org/press-center/press-releases/ama-apha-ashp-statement-ending-use-ivermectin-treat-covid-19 (viewed Oct. 12, 2024).
[32] https://www.ncbi.nlm.nih.gov/books/NBK570371/pdf/Bookshelf_NBK570371 (viewed

127.    While the NIH position returned to a "do not use" recommendation based on studies that have been the subject of considerable criticism and controversy, the fact that NIH recognized there was some evidence in support demonstrates that the ABIM conclusion that there is no evidence in support of Plaintiffs Kory's and Marik's position on ivermectin is a statement of bias and not science.

128.    ABIM conducted itself as part of a public health agency agenda that determined, far before sufficient evidence was available including any post-surveillance vaccination monitoring, that the mRNA vaccine had to be presented as highly safe and effective without allowing contrary viewpoints in order to limit vaccine hesitancy irrespective of the truth.

129.    The medical consensus that has been advanced by ABIM and others that the widely available, inexpensive off-patent drugs advocated by Drs. Kory and Marik were not safe or effective was unduly influenced, either directly or indirectly, by the billions of dollars available in the market for patentable drugs and vaccines.

130.    On information and belief, ABIM has not been independent of financial influences that have affected the manner in which COVID-19 research has been conducted and interpreted, potentially including ties to pharmaceutical interests that could be affected if less expensive treatments are recommended.

131.    Among the large body of evidence introduced to show the legitimacy of the debate surrounding these issues, Drs. Kory and Marik introduced an eight-page open letter

_____

Oct. 12, 2024).

sent to the American Board of Medical Specialties (ABMS) and the Federation of State Medical Boards (FSMB) on behalf of Drs. Kory and Marik, among others, entitled "The destruction of Member Boards' credibility Open letter June 26, 2022," which directly criticized ABIM for its efforts to suppress legitimate debate by threatening to take this action against Drs. Kory and Marik. The letter was signed by more than 830 individuals of whom more than 500 were physicians or other health professionals.

132.    Over the course of the disciplinary matter, Drs. Kory and Marik presented substantial argument in support of their positions including references to hundreds of published studies supporting the scientific merits of the statements at issue, and responded to the evidence upon which ABIM relied with detailed critiques supported by other experts in the field. The studies upon which ABIM relied included demonstrably biased study designs, poor and incomplete interpretations of the data, and conflicts of interest among other defects. ABIM in large part ignored or rejected Plaintiffs Kory's and Marik's arguments without reasonable basis.

133.    Despite decades of use and billions of prescriptions for ivermectin with a very high safety profile, ABIM relied on false and misleading reports that transformed this safe drug into a supposedly risky one, arising from numerous media campaigns including false statements made by the U.S. Food and Drug Administration that were withdrawn by the FDA in settlement after an unfavorable decision about its "You are Not a Horse" ivermectin campaign, by the Fifth Circuit in *Apter v. HHS*, 80 F.4th 579 (5th Cir. 2023).

134.    As but one example ABIM cited as putting the ivermectin matter to rest, ABIM cited the TOGETHER trial in Brazil which concluded that ivermectin was not more

effective than a placebo. Among dozens of substantial design flaws in this study, ivermectin is readily available over the counter and widely used for COVID-19 in Brazil and yet the study made no effort to control for the use of ivermectin by those in the control arm, thereby hopelessly contaminating the study. The ABIM Decisions are silent on this and other substantial arguments made by Drs. Kory and Marik.

135. In its submissions about mRNA vaccine concerns, Drs. Kory and Marik presented evidence in support of numerous concerns including substantial data that "all-cause" mortality has been elevated by the mRNA vaccine; V-Safe (CDC) data shows significant safety concerns that public health authorities have not communicated to the public; Vaccine Adverse Event Reporting System (VAERS, comanaged by the CDC and FDA) data reveals significant safety concerns (even accounting for unsubstantiated reports); epidemiologic data demonstrates highly alarming safety signals; there are substantial risks associated with receipt of a COVID-19 mRNA vaccination, particularly in younger patients, which have been globally recognized by many governments who are at odds with the CDC position; numerous studies demonstrate negative efficacy; evidence demonstrates that vaccination is not effective in preventing severe disease and that the evidence alleging to show significant reduction in COVID severity and mortality from the mRNA vaccine is overstated.

136. The ABIM Decisions focused on a few selected studies to support its viewpoint while failing to respond to evidence before it. Instead, the ABIM Decisions are argumentative rather than scientific, and ignores legitimate debate. ABIM imposed the biased views of those seeking to impose vaccine mandates rather than allow inexpensive

early treatment.

137.    The *ABIM Policies* state that the determination of credentialing revocation is to be made solely and independently by the three panel members who hear the final appeal. *ABIM Policies* at 18 ("Disciplinary Sanctions and Appeals"). The three panel members who adjudicated Drs. Kory and Marik's board certification have no significant experience with the treatment of COVID-19 and thus no substantive expertise upon which to judge these two highly experienced critical care physicians who have made the treatment of COVID-19, finding repurposed drugs for use in COVID-19, and treatment of vaccine-injured patients the focus of their work since the pandemic began.

138.    ABIM cited as part of their basis for revocation that Plaintiffs Kory and Marik were "founding members" of the Front Line COVID-19 Critical Care Alliance (FLCCC), an organization that "was formed by leading critical care specialists and dedicated to developing highly effective treatment protocols to prevent the transmission of COVID-19 and to improve the outcomes for patients ill with the disease."[33] The FLCCC is a 501(c)(3) organization in which many qualified medical professionals collaborate to determine proper standards in the rapidly evolving science of the pandemic, has a substantial basis for its conclusions and operates as an organization with its own rights to freedom of speech and association. ABIM improperly punished Plaintiffs Kory and Marik for exercising their freedoms of speech and association by founding FLCCC. The extensive participation of many hundreds of physicians in FLCCC support the fact that it is a position

---

[33] https://covid19criticalcare.com/about-the-flccc (viewed Oct. 12, 2024).

of legitimate debate and that the positions faulted by ABIM concerning Drs. Kory and Marik have the backing of a many in the medical community in the development of protocols that thousands of patients have reported have saved lives.

139.    Plaintiffs Kory and Marik have testified before numerous occasions before Congressional and state committees on the suppression of ivermectin and concerns about mRNA vaccine safety that the ABIM labeled as misinformation in the ABIM Decisions. The ABIM action is retaliation against Drs. Kory and Marik for exercising their right of freedom of speech and for taking positions contrary to the ABIM's public positions.

140.    Defendant ABIM's revocation of Drs. Kory and Marik's board certifications intentionally sends a strong message to board-certified physicians that if they do not follow what the ABIM considers "consensus" medicine their credential can be revoked with devastating consequences to their livelihoods, reputations, and relationships with their colleagues and patients.

141.    Florida Surgeon General Joseph Ladapo, M.D., has publicly taken positions similar to those of Plaintiffs Kory and Marik regarding ivermectin and mRNA vaccines for COVID-19, and Dr. Ladapo is board certified by Defendant ABIM in Internal Medicine. Yet ABIM has not taken any adverse action against Dr. Ladapo even though he has recommended against mRNA vaccination. Defendant ABIM has retaliated against Plaintiffs Kory and Marik for taking positions substantially identical to the positions taken by the Surgeon General of the third most populous state in the United States.

### Defendants' Actions Against Plaintiff Hanson

142.    ABFM sent Plaintiff Hanson a letter dated September 13, 2023, in which

ABFM threatened to take action against his board certification based on roughly a dozen Rumble videos and postings (or shares) by Hanson on Twitter (now X) and Facebook. Hanson's comments were similar to those by many other critics of the vaccine mandates and other policies by the federal agency officials towards COVID-19. For example, the first objection by ABFM was to Hanson's statement that "[t]his technically is not a vaccine. This is a gene injection - RNA or DNA." (quoting a statement by Hanson on a Rumble video dated May 7, 2021). ABFM further complained about Hanson's references to the VAERS, which is a government-maintained database carrying penalties for any false reporting to it.

143.    None of ABFM's complaints were based on patient care by Dr. Hanson, and no adverse outcomes by patients were cited by ABFM. It did not disclose the source of the complaint about Dr. Hanson, which could have been from the federal government (which does not regulate medicine), by another Board Defendant, or by a politically motivated internet troll.

144.    Dr. Hanson promptly responded to ABFM seeking clarification as to what precisely ABFM asserted was inaccurate about anything he said. Dr. Hanson requested specific proof that anything he said was incorrect. Yet Dr. Hanson heard nothing back from ABFM for eight months. Then, by its letter dated May 21, 2024, ABFM's response provided no specific evidence that anything Dr. Hanson said was incorrect, and instead relied on general rhetorical or even irrelevant arguments. For example, in objecting to Hanson's use of the government-run VAERS, ABFM states that "there are reports of individuals becoming the Incredible Hulk post-vaccine in the VAERS database" without

mentioning the statistical insignificance of such rare, implausible assertions.

145. Without ever providing Plaintiff Hanson with a hearing, ABFM informed him that his ABFM board certification was rescinded and withdrawn as of the date of its letter, May 21, 2024. But ABFM has held that revocation in abeyance pending its board meeting scheduled sometime in October, without providing Hanson a hearing then either.

146. While Defendant ABFM purported to base its actions against Plaintiff Hanson on patient care, in fact none of the comments by Dr. Hanson to which ABFM objected were part of patient care. Rather, ABFM retaliated against Dr. Hanson based on his criticisms of government policies, public officials, federal agencies, and public corporations.

## COUNT I
## INFRINGEMENT BY ALL DEFENDANTS ON ALL PLAINTIFFS' FIRST AMENDMENT FREEDOM OF SPEECH

147. Plaintiffs incorporate all other paragraphs in this Amended Complaint as if fully set forth herein.

148. Defendants have been misusing their power and authority to discriminate based on viewpoint, and thereby cause a chilling effect on freedom of speech.

149. This partisan retaliation by the Board Defendants has been based in part on statements by physicians warning pregnant woman against receiving the COVID vaccine, even though the World Health Organization issued a similar warning in 2021.

150. Defendants' partisan retaliation has focused in part on those who criticized Dr. Fauci. Though repeatedly proven wrong or having contradicted himself, Dr. Fauci declared on the nationally televised *Face the Nation* that "I represent science" and that his

critics "are really criticizing science."[34] Republican Senators, including Dr. Rand Paul (R-KY) and Ted Cruz (R-TX), sharply rebuked Dr. Fauci for his statements and yet the Board Defendants seek to revoke, and in some cases have revoked, earned board certifications from physicians in part for criticizing Dr. Fauci and his policies toward COVID-19.

151.    Defendant ABOG, in a public announcement dated July 7, 2022, threatened physicians who make public statements against abortion or contraception, indicating that "[e]ligibility to gain or maintain ABOG certification may be lost."[35] ABOG is stridently supportive of universal access to abortion and taxpayer funding of it, and ABOG sharply criticized the U.S. Supreme Court decision in *Dobbs v. Jackson Women's Health Org*.

152.    On June 24, 2022, in a coordinated manner, Defendant ABIM issued a statement that it stands with Defendant ABOG and others in opposing the Supreme Court decision in *Dobbs*, and in declaring that it "will cause health care to deteriorate in the US for many years to come."[36] ABIM joined a statement by the AMA that "condemns" this Supreme Court decision as "egregious",[37] similar to the position against the same Supreme Court decision taken on that same day by the Biden Administration. In 2020, ABIM also criticized President Trump's proposed rules to protect the right of conscience of physicians

---

[34] https://www.cbsnews.com/news/transcript-dr-anthony-fauci-on-face-the-nation-november-28-2021/ (transcript of Nov. 28, 2021, viewed Oct. 2, 2024).
[35] https://www.abog.org/about-abog/news-announcements/2022/07/07/statement-regarding-misinformation-and-disinformation-and-medical-professionalism (viewed Oct. 17, 2024).
[36] https://blog.abim.org/abim-supports-reproductive-health-and-access-to-care/ (viewed Oct. 2, 2024).
[37] https://www.ama-assn.org/press-center/press-releases/ruling-egregious-allowance-government-intrusion-medicine (viewed Oct. 2, 2024).

to decline to provide transgender interventions,[38] by which ABIM again agreed with the position to be taken by the incoming Biden Administration.

153.    Defendants have never carved out clearly protected speech, such as criticism of public figures or legitimate debate in the public interest, and have not refrained from retaliating against or censoring that speech.

154.    By their foregoing actions, Defendants cause injury to Plaintiff AAPS in the form of a decrease in attendance at its conferences and in donations to it.

155.    The Board Defendants are state actors with respect to their threatened and actual revocation of board certification.

156.    Defendant ABFM's foregoing retaliation against Plaintiff Hanson, taken based on collusion with other Defendants, was pending when he attended a conference by AAPS held in San Antonio in September 2024.

157.    Defendant ABIM's actions and its ABIM Decisions punished Plaintiffs Kory and Marik for exercising their First Amendment rights and were intentionally designed to squelch their Free Speech rights by interfering with their ability to advocate for their medical positions and to testify as expert witnesses in court, as many courts require board certification of expert witnesses.

158.    By acknowledging that "legitimate scientific debate" should be protected in its published Policies and Procedures, *ABIM Policies* at 19, Defendant ABIM has voluntarily adopted freedom of speech principles as part of its obligation to its Diplomates

---

[38] https://blog.abim.org/reaffirming-community-values-transgender-rights-in-health-care-matter/ (viewed Oct. 2, 2024).

(those who are board certified), even to the extent that ABIM may be adjudicated to merely be a private actor.

159. The Board Defendants have communicated and worked with federal agency officials, seeking to advance a particular partisan agenda on issues relevant to this case.

160. The Board Defendants impose their censorship as alleged herein either at the partisan request of federal agency officials and Democrats in Congress, or in the expectation of obtaining favoritism from them as a result.

161. The nearly simultaneous public announcements and sending of threatening letters by the Board Defendants, often using similar terminology, is part of a broader campaign by and with federal agency officials to advance their particular partisan agenda concerning COVID-19 and abortion.

162. Many hospitals and insurance networks require certification by the Board Defendants, and thus their revocation of board certification can have a devastating effect on the practice of medicine by a physician, in some cases having the same practical effect as revoking his license to practice medicine.

163. The Board Defendants have had less restrictive means to alert the public that they disagreed with the positions taken by the Individual Plaintiffs, and did not need to revoke their long-standing and well-earned certifications to express scientific disagreement.

164. Defendants' conduct as alleged herein has an intentionally chilling effect on speech, and thereby infringes on the First Amendment's protection of freedom of speech by Plaintiffs.

165.    Defendants' conduct as alleged herein has infringed on the First Amendment's protection of freedom of speech by the Individual Plaintiffs such that they have been professionally harmed and lost opportunities, for which they seek monetary compensation.

166.    Plaintiffs seek an injunction against Defendants' retaliation against physicians who speak out on matters of public concern, which is in violation of Plaintiffs' First Amendment rights.

167.    Plaintiffs further seek a declaratory judgment that Defendants' foregoing conduct is unconstitutional.

168.    Plaintiffs seek full remedies from Defendants, including attorneys' fees, which are available under 42 U.S.C. §§ 1983 and 1988.

## COUNT II
## VIOLATION BY DHS AND NOEM OF THE APA BASED ON FACA

169.    Plaintiffs incorporate all other paragraphs in this Amended Complaint as if fully set forth herein.

170.    Mayorkas immediately and directly adopted the *Subcommittee Final Report*, which triggers the application of FACA to the Subcommittee because it thereby directly advised the Secretary. "'If a subcommittee makes recommendations directly to a Federal officer or agency, or if its recommendations will be adopted by the parent advisory committee without further deliberations by the parent advisory committee, then the subcommittee's meetings must be conducted in accordance with all openness requirements'" of FACA. *Elec. Privacy Info. Ctr. v. Drone Advisory Comm.*, 995 F.3d 993,

999 (2021) (quoting 41 C.F.R. § 102-3.145, bracketing removed).

171. FACA applies because Mayorkas adopted the Subcommittee recommendations "without further deliberations" by HSAC.

172. Mayorkas was the agency head responsible for appointing members to HSAC and its Subcommittee.

173. FACA requires that:

the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying at a single location in the offices of the advisory committee or the agency to which the advisory committee reports until the advisory committee ceases to exist.

5 U.S.C. app. 2 § 10(b).

174. FACA requires that Defendant Noem ensure that the membership of the HSAC and its Subcommittee are "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee." 5 U.S.C. app. 2 § 5(b)(2).

175. HSAC and its Subcommittee have not been fairly balanced with respect to First Amendment issues of free speech and restraints on government power, and with the range of scientific views on controversial issues.

176. Mayorkas and then Defendant Noem have failed to make available to the public many of the minutes and documents of the Subcommittee of HSAC concerning its communications, deliberations, and activities with respect to the creation and purported discontinuation of the DGB and other censorship activities.

177. Plaintiffs Kory and Marik have had statements they posted describing their views about the proper treatment of COVID-19 removed from social media,

including Twitter (now X), and upon information and belief that was caused at least in part by censorship activities by the Department of Homeland Security.

178. Mayorkas failed to publish adequate advance notice of meetings of the Subcommittee in the Federal Register and make their meetings open to the public.

179. The foregoing conduct by Mayorkas and subsequently Defendant Noem constitutes final agency actions under the APA, 5 U.S.C. § 706.

180. This conduct by Mayorkas and Defendant Noem is in violation of FACA, and is thereby arbitrary, capricious, an abuse of discretion, and contrary to law, in violation of the APA, 5 U.S.C. § 706(2)(A), (B) and (D).

181. The foregoing violations of the APA and FACA have injured Plaintiffs by denying their rights to have their interests represented on HSAC and its Subcommittee while they have acted and continue to act under the command of Mayorkas and then Defendant Noem to make recommendations to them.

182. These injuries to Plaintiffs are likely to persist as long as Defendant Noem or the Department of Homeland Security is allowed to continue to direct the operation of HSAC in violation of FACA, and withhold from the public documents related to the Subcommittee for which disclosure is required by FACA.

183. Plaintiffs seek a declaration that HSAC and its Subcommittee have violated FACA.

184. Plaintiffs seek an injunction ordering Defendant Noem to comply fully with FACA with respect to the HSAC and its Subcommittee, including making the required disclosures and establishing the requisite balance.

## COUNT III
## THE BOARD DEFENDANTS' TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS OF ALL PLAINTIFFS

185.    Plaintiffs incorporate all other paragraphs in this Amended Complaint as if fully set forth herein.

186.    The Board Defendants are tortiously interfering with Plaintiff AAPS's medical conferences and donations to it.

187.    Specifically, there is a reasonable probability that Plaintiff AAPS would have entered into a business relationship with third parties, namely conference attendees and donors.

188.    The Board Defendants know that interference with both presentations by physicians at these conferences co-sponsored by Plaintiff AAPS and its posting on the internet of videos from these conferences is substantially certain to occur as a result of the conduct by the Board Defendants in threatening to take action against physicians who speak out.

189.    The conduct by the Board Defendants is independently tortious in improperly retaliating against physicians for their public statements on matters of public policy.

190.    The ABIM Decisions tortiously interfere with the Individual Plaintiffs' rights and opportunities as physicians, expert witnesses and public health advocates, retaliate against them for their viewpoints, and are an intentional effort to suppress their professional endeavors to conduct research, work with their colleagues, treat patients, have institutional affiliations and express their point of view

191. Defendant ABIM willfully and intentionally set about to disparage Plaintiffs Kory's and Marik's reputations and abilities to function in their careers as physicians, as expert witness, and as advocates for public health policy change.

192. The ABIM Decisions, and the posting and reporting of same, have proximately caused injuries to Plaintiffs Kory and Marik by undercutting them in all of their professional capacities.

193. Board Defendants have thereby proximately caused injury to Plaintiff AAPS in the form of chilling speech by physician speakers at its conferences, reducing attendance, and decreasing AAPS's ability to post videos on the internet of presentations made at its conferences, and to attract donations accordingly.

194. Plaintiff AAPS has suffered actual damages and losses in donations as a result of this conduct by the Board Defendants.

195. The Individual Plaintiffs have suffered special damages as a result of lost wages and reduced future earnings, for which they seek full recovery.

196. The Individual Plaintiffs further seek punitive damages from the Board Defendants for their conduct as alleged herein.

## COUNT IV
## THE BOARD DEFENDANTS' VIOLATION OF SECTION 1 OF THE SHERMAN ACT

197. Plaintiffs incorporate all other paragraphs in this Amended Complaint as if fully set forth herein.

198. The Board Defendants have colluded and conspired with each other in adopting similar approaches for retaliation against physicians based on their public

statements.

199.    Prior to 2020, it was unheard of for the Board Defendants to revoke a physician's board certification based on disapproval of statements made by him in public.

200.    At roughly the same time and while using identical terminology of "misinformation" and "disinformation", the Board Defendants issued very similar threatening statements about revoking the board certifications of physicians based merely on what they said publicly, and not on how they treated patients.

201.    Board Defendants ABIM and ABFM took actions that were nearly identical in substance, scope and timing.

202.    Reflecting their collusion, Defendants ABIM and ABFM issued a joint statement expressing their threats against board-certified physicians on September 9, 2021, which stated that:

> The Federation of State Medical Boards (FSMB), which supports its member state medical licensing boards, has recently issued a statement saying that providing misinformation about the COVID-19 vaccine contradicts physicians' ethical and professional responsibilities, and therefore may subject a physician to disciplinary actions, including suspension or revocation of their medical license. We at the American Board of Family Medicine (ABFM), the American Board of Internal Medicine (ABIM), and the American Board of Pediatrics (ABP) support FSMB's position. We also want all physicians certified by our boards to know that such unethical or unprofessional conduct may prompt their respective board to take action that could put their certification at risk.[39]

203.    Board Defendant ABOG's threatened retaliation was used against a critic of abortion at a congressional hearing, in what appeared to be a pre-arranged question and

---

[39] https://www.abim.org/media-center/press-releases/joint-statement-on-dissemination-of-misinformation/ (viewed Oct. 18, 2024).

answer between a congressman and a witness who were allied with each other on the abortion issue, and against this physician who subsequently presented at an AAPS conference.

204.   As conceded by counsel for the Board Defendants on appeal in this action and held by the U.S. Court of Appeals for the Fifth Circuit in what becomes the law of this case, "Collusion always creates antitrust problems." *Ass'n of Am. Physicians & Surgeons Educ. Found. v. Am. Bd. of Internal Med.*, 103 F.4th 383, 399 (5th Cir. 2024) (Ho, J., dissenting in part, quoting the appellate Oral Argument at 32:27-33:01).

205.   Likewise, "an agreement to exclude certain viewpoints and shun providers who adopt such views could constitute 'a concerted refusal to deal under § 1,'" which is what the Board Defendants have done as alleged above. *Id.* (quoting a concession by the Board Defendants' counsel during the appellate Oral Argument at 35:03-37:59).

206.   The ABIM Decisions against Plaintiffs Kory and Marik have caused them monetary injuries in the form of lost wages and compensation because Defendant ABIM has a monopoly over this certification, and there is no alternative body that Drs. Kory and Marik can turn to for certification that would enable them restore their professional recognition upon which their practices depend.

207.   Plaintiff Hanson, as an ABFM board-certified physician who is being victimized by retaliation against his board certification based on the Board Defendants' scheme, has been directly injured by their actions.

208.   The Board Defendants' foregoing conduct constitutes a violation of Section 1 of the Sherman Act and injures Plaintiff AAPS by causing it a loss in revenue.

209. Plaintiffs seek injunctive relief under 15 U.S.C. § 26 prohibiting the Board Defendants from retaliating against physicians based on their public statements on matters of public policy.

210. Plaintiffs further seek a declaration that the Board Defendants are misusing their monopoly power over certification, which is based on written multiple-choice examinations, to retaliate against physicians for their public statements on matters of public policy.

211. Plaintiffs seek treble damages and attorneys' fees under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

## COUNT V
## THE BOARD DEFENDANTS' VIOLATION OF SECTION 2 OF THE SHERMAN ACT

212. Plaintiffs incorporate all other paragraphs in this Amended Complaint as if fully set forth herein.

213. The Board Defendants each have certification monopolies in their respective medical practice specialties, each controlling roughly 80% of the market for certification of physicians in their corresponding specialties.

214. Certification by the Board Defendants is required of physicians to practice at many hospitals and in many insurance networks.

215. Certification by the Board Defendants is based primarily on the performance by physicians on written multiple-choice examinations, and the payments of fees by physicians.

216. The Board Defendants have invidiously abused their examination-based

monopoly in order to interfere with physicians' freedom of speech, by threatening revocation of their certifications based on statements by physicians on matters of public concern.

217. The Board Defendants have thereby wrongly interfered with the market for medical conferences and the posting of presentations from such conferences on the internet.

218. Plaintiff AAPS is engaged in the business of co-sponsoring medical conferences and posting presentations from such conferences on the internet, based on which Plaintiff AAPS raises donations.

219. The Board Defendants' foregoing conduct interferes with Plaintiff AAPS's business activities, and thereby impedes competition in the market of medical conferences and fundraising based on presentations posted on the internet.

220. The Board Defendants' foregoing conduct constitutes the willful maintenance of their monopoly power by chilling freedom of speech in order to advance a political agenda preferred by a major political party in Congress and officials in the Executive Branch of the federal government, and thereby gain favors from federal officials to perpetuate this monopoly power by the Board Defendants.

221. While "[t]ypically, parties with antitrust injury are either competitors, purchasers, or consumers in the relevant market," the Fifth Circuit's very next sentence states that "[b]ut standing is not necessarily limited to this group." *Waggoner v. Denbury Onshore, LLC*, 612 F. App'x 734, 737 (5th Cir. 2015). Misuse of monopoly power to censor speech about matters of public policy is a cognizable type of antitrust injury.

222. The Board Defendants intend by their foregoing conduct to maintain their

monopoly over board certification, by appeasing demands by federal agency officials and Democrats in Congress to censor speech based on viewpoint.

223.    The Board Defendants' foregoing conduct constitutes a violation of Section 2 of the Sherman Act and injures Plaintiffs by causing them losses in revenue.

224.    Plaintiffs seek injunctive relief under 15 U.S.C. § 26 prohibiting the Board Defendants from retaliating against physicians based on their public statements on matters of public policy.

225.    Plaintiffs further seek a declaration that the Board Defendants are misusing their monopoly power over certification to retaliate against physicians for their public statements on matters of public policy.

226.    Plaintiffs seek treble damages and attorneys' fees under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

## COUNT VI
## VIOLATION OF CONSTITUTIONAL AND CONTRACTUAL DUE PROCESS BY DEFENDANTS ABIM AND ABFM CONCERNING THE INDIVIDUAL PLAINTIFFS

227.    Plaintiffs incorporate all other paragraphs in this Amended Complaint as if fully set forth herein.

228.    Plaintiffs Kory and Marik received a mere one-day, combined hearing from Defendant ABIM, while the outcome was predetermined and the ensuing ABIM Decisions failed to address voluminous evidence in support of these Plaintiffs.

229.    Providing the appearance of procedural compliance with a "hearing" does not comport with due process principles of the Fourteenth Amendment to the U.S.

Constitution, and as required by the contractual obligations owed by ABIM to the Individual Plaintiffs, who purchased board certification based on a set of policies and procedures.

230.    Defendant ABIM acted in collusion with others, who had a biased agenda, in revoking the board certifications of Plaintiffs Kory and Marik contrary to due process.

231.    ABIM's requirement that Plaintiffs Kory and Marik speak only about "consensus-driven scientific evidence" is directly contrary to the ABIM Policy & Procedures statement that recognizes a role for "legitimate scientific debate," and ABIM thereby further violated due process. *ABIM Policies* at 19.

232.    In violation of due process, Defendant ABFM revoked the board certification of Plaintiff Hanson without providing him with ***any*** hearing.

233.    The Individual Plaintiffs seek compensatory and punitive damages from Defendants ABIM and ABFM for their resultant injuries.

## COUNT VII
## DEFAMATION BY DEFENDANT ABIM OF PLAINTIFFS KORY AND MARIK

234.    Plaintiffs incorporate all other paragraphs in this Amended Complaint as if fully set forth herein.

235.    The ABIM Decisions, ABIM's report of the ABIM Decisions as it made available to the public on ABIM's website,[40] media reports and communications by ABIM

---

[40] https://www.abim.org/verify-physician (viewed Oct. 12, 2024).

with the *Washington Post*[41] and *Medscape*,[42] ABIM's disparaging reports about Plaintiffs Kory and Marik as ABIM sent to the National Practitioner Data Bank and others, have conveyed information to the public and third parties which is false and damaging to Plaintiffs Kory and Marik, and which holds them in a false light and constitutes defamation.

236. The ABIM Decisions are *per se* defamatory as they constitute a finding regarding Plaintiffs Kory and Marik in their professional capacity as physicians and their standing in the professional community. Defendant ABIM stated that after allegedly fair deliberation by a certifying body Drs. Kory and Marik were found incompetent to make medical decisions and have spread misinformation. These statements by ABIM to third parties about Plaintiffs Kory and Marik have adversely affected their reputations, good names, and livelihoods as physicians, expert witnesses, advocates and their personal lives, lowered the estimation of these Plaintiffs in their professional community, and deterred third parties from associating or dealing with them.

237. Defendant ABIM willfully and intentionally set about to disparage Plaintiffs Kory and Marik's reputations and abilities to function, and to hold them in a false light in their careers as physicians, as expert witness and as advocates for public health policy change.

238. Rather than act with scientific integrity but with the intention to disparage Drs. Kory and Marik for their views, damage their ability to speak as experts on these

---

[41] https://www.washingtonpost.com/politics/2024/08/13/doctors-accused-spreading-misinformation-lose-certifications/ (viewed Oct. 12, 2024).
[42] https://www.medscape.com/viewarticle/abim-revokes-certification-two-physicians-accused-covid-2024a1000f0w?form=fpf (viewed Oct. 12, 2024).

controversial public health topics and cause them reputational harm, ABIM acted with malice toward Plaintiffs Kory and Marik. ABIM knew or should have known that its statements about Plaintiff Kory and Marik, as ABIM published to third parties, were misleading and substantially false.

239. Plaintiffs Kory and Marik seek presumed, compensatory and punitive damages against Defendant ABIM for the harm caused to them by its foregoing actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask this Court to grant the following relief:

A. Enter judgment in favor of Plaintiffs and against Defendants on all counts;

B. Pursuant to 28 U.S.C. §§ 1331 and 2201-02, FED. R. CIV. P. 57, and this Court's equitable powers, a declaratory judgment that Defendants have unlawfully violated Plaintiffs' First Amendment rights and, pursuant also to 5 U.S.C. §§ 702, 706, that Defendant Noem has violated the APA with respect to FACA;

C. An award under 42 U.S.C. § 1983 against all Defendants for the damages caused by their infringement on the First Amendment rights of Plaintiffs;

D. Pursuant to 28 U.S.C. §§ 1331, 1367 and 2201-02, FED. R. CIV. P. 57, a declaratory judgment that Defendants ABIM, ABOG, and ABFM have tortiously interfered with Plaintiffs and abused their monopolies over examination-based certification by threatening and taking retaliation against physicians for speaking out about matters of public concern, an injunction under 15 U.S.C. § 26 and the common law prohibiting such retaliation by these Defendants, and an award of damages to the Individual Plaintiffs to compensate them fully for their injuries from the revocation

of their board certifications, including treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15;

E.    Pursuant to 28 U.S.C. §§ 1331, 1367 and 2201-02, 42 U.S.C. § 1983, and FED. R. CIV. P. 57, a declaratory judgment that Defendants ABIM and ABFM have violated constitutional and contractual due process rights with respect to the Individual Plaintiffs, an injunction against Defendants ABIM and ABFM to cease and desist such conduct, and an award of damages to the Individual Plaintiffs to compensate them fully for their resultant injuries;

F.    An award of compensatory and punitive damages against Defendants ABIM and ABFM for defaming Plaintiffs Kory and Marik, and an award of punitive damages under the other causes of action asserted by these Individual Plaintiffs;

G.    Pursuant to 28 U.S.C. §§ 1331, 1361, and 2201-02, FED. R. CIV. P. 57, and this Court's equitable powers, an injunction requiring Defendant Noem to cease censorship activities and fully comply with FACA with respect to these activities, including full disclosure to the public of all censorship-related documents;

H.    Pursuant to 28 U.S.C. §§ 1331, 1361, and 2201-02, FED. R. CIV. P. 57, and this Court's equitable powers, an injunction requiring Defendant Noem to comply fully with FACA in connection with all activities by HSAC and its Subcommittee;

I.    An award to the Individual Plaintiffs in full recovery of their special damages that Board Defendants have caused in the form of lost wages and reduced future earnings.

J.    An award against all Defendants of reasonable attorneys' fees to Plaintiffs for

bringing this lawsuit in the public interest and as provided by the Clayton Act, 15

U.S.C. § 15 and, as to Prayers B-C and G, under 42 U.S.C. § 1988 and the Equal

Access to Justice Act (EAJA), 28 U.S.C. § 2412; and

K.      Such additional relief as may be just and proper.

Dated: January 29, 2025                          Respectfully submitted,

                                                 /s/ Andrew L. Schlafly

                                                 Andrew L. Schlafly
                                                 Attorney-in-charge
                                                 State of New Jersey Bar ID 04066-2003
                                                 SD Texas Bar ID NJ04066
                                                 939 Old Chester Rd.
                                                 Far Hills, NJ 07931
                                                 Tel: 908-719-8608
                                                 Fax: 908-934-9207
                                                 Email: aschlafly@aol.com

                                                 *Counsel for Plaintiffs Association of
                                                 American Physicians and Surgeons
                                                 Educational Foundation, Pierre Kory,
                                                 M.D., Paul Marik, M.D., and Karl N.
                                                 Hanson, M.D.*